DECISION
This matter comes before the court on Plaintiffs complaint for quieting title and for injunctive and declaratory relief. This action centers around a dispute over ownership of a piece of land in Jamestown, Rhode Island. The Plaintiffs claim a portion of the disputed area by quitclaim deed. Defendant claims all of the disputed land by quitclaim deed, adverse possession and warranty deed. The parties have stipulated to fifty-three facts and said stipulation is attached as Exhibit 1. The court has inspected the property in controversy and toured the surrounding area (in the company of all parties and their counsel).
In 1947, Federal Building (Federal) purchased a parcel of property which included the land currently owned by all parties in this action, including the disputed area. The disputed area of land is a strip which runs North to South to the waterfront.
In 1948, Federal sold a 4 acre lot to Thomas McGrath, Exhibit 8. In October, 1978, McGrath's son sold the 4 acre lot to the defendant, Joan Dupee via warranty deed, Exhibit 9. At trial, Dupee testified that she read the warranty deed and noted the 300' x 600' (4 acres) dimensions. The defendant also testified that at the closing, she was also given a "quitclaim deed" and a copy of a contemporaneous tape survey. The tape survey describes the property as 346' x 847,' a lot in excess of 6 acres, Exhibit11. During her testimony, the defendant also revealed that in 1978 she viewed a tax plat of her lot and that said map clearly shows the lot size as approximately 4 acres.
In 1979, Federal subdivided the remaining property and filed a plat, Exhibit 4A. Over the next few years, Federal's property was sold a couple of times and, finally, in 1983, it was purchased by Jamestown Estates.
In 1987, Jamestown Estates re-subdivided the property surrounding defendant's land. Defendant testified that she viewed the subdivision plans and did not object. These plans clearly incorporate the disputed land into the Carnevale lot rather than the Dupee property.
In 1990, Jamestown Estates sold subdivision lot 2 to the Carnevales. Plaintiff Rodriguez purchased his land in December of 1990 via quitclaim deed. On July 3, 1992, defendant served Plaintiff Carnevale with a Notice of Intent to Dispute.
The Carnevales claim that their deed from Jamestown Estates granted them a strip of land which, on the plat map, looks like a panhandle and which serves as direct access to the water. The Carnevales further complain that "the defendant has attempted to impede the plaintiffs' use of a strip of plaintiffs' land 22 feet wide by 668 feet long . . . by maintaining a fence on plaintiffs' strip of land . . . thereby preventing plaintiffs from utilizing the northwesterly portion of their land which leads to the waterfront." Plaintiffs' Complaint, Plaintiff, Ronald Rodrigues intervened on the ground that he is the owner of Assessor's Plat 8, Lot 663 which abuts plaintiffs' lot as well as defendant's lot.
In her Answer, the defendant alleges that she is the record owner of the disputed land by adverse possession.
 The Deeds
The 1948 Federal-McGrath deed conveys the following:
 "Beginning at a point on the westerly side of the North Main Road so-called, distant southwardly six hundred (600) feet more or less from the center line of the creek so-called; and where a wire fence running westwardly bounds the property approximately thirty-two (32) feet six (6) inches more or less south from the center of a white stone gatepost on the south side of the gateway, and running in a westwardly direction, following the line of the said wire fence and continuing to point three hundred (300) feet more or less, from the point of beginning marked by an iron pipe . . . the above described premises containing four (4) acres of land. Exhibit 8.
The warranty deed from McGrath to Dupee contains the exact same conveyance language as that of the 1948 Federal-McGrath deed. The tax cards kept by the town of Jamestown indicate that the defendant owns a parcel totaling 3.60 acres. Exhibit 14.
The Jamestown Estates — Carnevale deed conveys Lot 2, which is Assessor's Lot 662. The Tax Assessor's map indicates the disputed area as being a panhandle of the conveyed lot 662. This disputed strip also abuts Plaintiff Rodrigues' property. These deeds do not specifically describe in metes and bounds the land to be conveyed. However, attached to these deeds is a Tax Assessor's map which does in fact illustrate the boundaries of the three lots concerned as well as the disputed strip. Exhibit 1.
At trial, surveyor Richard Lipsitz testified as to the reliability of the Butler tape survey and the quitclaim deed as well as the actual boundaries of defendant's property. He testified that a tape survey is a rough estimation of the property lines, not an accurate measure. He also stated that the Ryan survey, Exhibit 3 (1) and (2)) describing the Carnevale lot properly relied upon the warranty deed description in the Federal-Dupee deed when fixing the boundaries of these three lots. This survey clearly includes the disputed strip in the Plaintiffs' lot. According to Mr. Lipsitz, the original warranty deed controls the accuracy of the survey. The expert testimony of Mr. Lipsitz is uncontradicted and deserving of great weight.
The warranty deed by which defendant took title, clearly describes exactly what property was being conveyed. This Court has followed the directions on the deed pertaining to the boundaries of the parcel and, in fact, has walked the property, both while looking at the surveyor's map in evidence. After so doing, this court finds that the strip in question was not included in the McGrath-Dupee conveyance. The warranty deed here correctly and specifically conveys that which McGrath owned. Neither the quitclaim deed nor the Butler tape survey could, merely by the use of different boundary descriptions, convey a title greater than the grantor had. Solomons Island Yacht Club,Inc. v. Elliott, 357 A.2d 848 (R.I. 1976).
Therefore, with respect to record title to the disputed strip, this court is convinced that the land was not and could not have been included in the McGrath-Dupee conveyance. The conclusion is inescapable, as a matter of law, that the record title of defendant Dupee does not now include, nor has it ever included, the strip of land presently in dispute.
 Adverse Possession
The defendant raises adverse possession as a defense to plaintiffs' claims. In support of her claim for adverse possession, the defendant argues that, "relying on the appearance of the property, in contrast to the surrounding land, the explanation of her grantor's agent, a drawn survey, fences, a building, concrete structures and a quitclaim deed, went into possession of the disputed land in good faith. She constantly maintained the lawn, she repaired the pump house and replaced the fences." Defendant's Post-trial Memorandum at 9. She also argues that she posted signs against trespassers and ordered people off her property.
In order to succeed on this claim, defendant must prove by strict, clear and convincing evidence:
 1. ten years of uninterrupted actual possession by the claimant or the claimant's predecessors or lessees;
 2. the possession must be open, notorious and hostile;
 3. the possession must be under claim of "proper sole and rightful estate in fee simple;"
 4. the possession must be exclusive
 5. the claim must be continuous and uninterrupted
Rhode Island General Laws (1956) § 34-7-1.
The statutory period in Rhode Island required for the establishment of title through adverse possession is ten years.Id. There is no evidence that prior to his conveyance to Dupee, McGrath asserted a "claim of right" with respect to the disputed strip. In fact, his warranty deed so clearly excludes this strip that the inference is against the aforementioned conclusion. Therefore, the starting date for an adverse possession claim is October 1978, when Dupee acquired her property.
The record supports and defendant admits that in 1987, when Jamestown estates re-subdivided the land surrounding hers, she was sent notice of said subdivision. The survey that was done in connection with this subdivision application clearly includes the disputed strip as a panhandle connected with the Carnevales' lotExhibit 3. Furthermore, in her deposition, defendant admitted that she went to the Town planning office to view the layout and did not object to the plan even though the maps clearly include the disputed area in the Carnevales' lot Deposition, 24.
In this court's opinion, these facts alone extinguish defendant's claim of right. During her ownership, at any time when defendant had an opportunity to openly and hostiley assert her claim on this disputed land, she chose to remain silent. It is human nature to defend that which one believes he or she owns. Accordingly, if defendant truly believed that she had an undisputed right to this strip, either by title or adverse possession, one would expect her to vigorously assert that right at every opportunity. In the instant case, despite such opportunity, defendant remained passive.
The court agrees with plaintiffs' argument that defendant's "failure to object to the subdivision and subsequent auction, and her coincident failure to assert her claims, bar her in equity from claiming title pursuant to the theories of equitable estoppel [and] laches." Plaintiffs' Post-trial Memorandum, 26. The conveyance to plaintiffs clearly, as far as this court is concerned, includes the disputed strip and therefore it is rightfully theirs.
For the aforementioned reasons, this Court enters judgment for the plaintiffs as prayed.